IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| AMERICAN ATELIER, INC., | : | |
| --- | --- | --- |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 13-7138 |
| | : | |
| MATERIALS, INC., | : | |
| Defendant. | : | |

MCHUGH, J.                                                                              December 22, 2015

## MEMORANDUM

This is a contract action brought by American Atelier, Inc., a manufacturer of specialty furniture, against Materials, Inc., a supplier of architectural products. Atelier contends that Materials supplied it with veneers (thin slices of wood used to produce flat panels for furniture) that did not conform to the terms of the contract and breached the implied warranty of merchantability. Discovery is now complete, and I am persuaded that on the evidence in this case, no reasonable jury could find either a breach of contract for the goods used or a breach of the warranty of merchantability. In simple terms, Atelier seeks to impose a duty on Materials which the contract does not support, and which Materials expressly disclaimed. Accordingly, Defendant's Motion for Summary Judgment will be granted as it pertains to all claims, except for a discrete and limited claim as to 41 sheets of veneer around the time the goods were tendered.

### I. Summary of Material Facts

Plaintiff Atelier was retained by the Loews hotel chain to build custom furniture for its rooms. It is undisputed that Loews' design professionals, Daroff Design, a well-known design and architectural firm, specified to Plaintiff that a particular wood veneer was to be used in the manufacture of the furniture. The selected veneer was manufactured in Italy by a well-known

1

and well-established supplier, Tabu, through a proprietary process that involves bleaching an African hardwood, Anigre, and infusing it with white dye. Compl. at ¶¶ 9–10; Def.'s Mem. in Supp. Mot. Summ. J. at 4. Atelier purchased the specified "Anigre veneers" from Materials, Tabu's U.S. distributor, and used them to construct the furniture. Plaintiff also alleges that some of the veneers were moldy when delivered, and replacement veneers were therefore sent and used in the construction of the furniture. Compl. at ¶ 15.

Within only a few months of installation, Loews complained that those portions of the furniture exposed to ultraviolet light from the sun had discolored and darkened to an amber color, and as a result Atelier incurred the cost of replacing the veneers with a different maple veneer. Goodman Dep. at 35:21–23. Surfaces of the Anigre veneer not exposed to sunlight maintained their original white appearance. Goodman Dep. at 94:23–95:2.

The written contract governing the sale in question is composed of three purchase orders requesting that Materials supply the Anigre veneer and a single attached page setting forth the "Terms of Sale." In the section of the contract entitled "Warranty Disclaimer," it states:

> All products distributed by Materials Inc. are manufactured to meet the standard industry specifications of our suppliers. Since MI has no control over end products fabricated with the material sold, no warranty is expressed or implied. ... MI makes no warranty based on any usage of trade of fitness for any particular use. Buyer assumes all risks resulting from the use with other substances or in any process.

This language clearly defines the role of Defendant Materials: it supplies wood products made according to the specifications of the manufacturers it represents, but takes no responsibility for the way in which the product is altered after sale during the buyer's fabrication process.

The next paragraph of that same section further defines the relationship between the buyer and seller. Turning to the fabricator's role, the section states: "All installation and fabrication are the buyers' responsibility, unless otherwise stated. Materials, equipment and

2

workmanship must conform to industry standard practices, conditions, procedures and recommendations." Materials as a seller is providing a wood product that will be subject to further finishing, and the contract explicitly provides that the responsibility for that finishing process rests with Atelier as buyer. The contract then provides the buyer with the option to seek information pertinent to effective finishing of the product; specifically, it cautions and advises buyers as follows:

> [Materials] may supply installation instructions or guidelines, as provided by the manufacturers, upon request. All wood surfaces, like all materials, will alter in color due to exposure to ultraviolet (UV) light or simply aging of the wood. Fading of wood surfaces can be reduced by the use of non-yellowing finishes that contain UV inhibitors.

The record reflects that Atelier did not request such assistance from Materials. Rather, it requested that samples of the Anigre veneer be sent so that a finishing consultant with which Atelier routinely worked, CCI, could test them for suitability. Goodman Dep. at 48–49. The record reflects that Materials complied with this request. Unfortunately (and somewhat inexplicably), the consultant that Atelier retained only tested for water repellency and did not do any testing pertinent to the issue of how the veneer might react with ultraviolet light after finishing. The relevant testimony in this regard comes from Plaintiff's president, David Goodman, a registered architect:

> Q: Did you send the samples of the white Anigre to CCI for them to analyze or did they come to you to analyze the Anigre?
> A: They're in our plant probably once a week. And they would — they would gladly do any kind of samples or analysis for us or testing. As far as samples that were prepared, they would take them to their facility and do their own testing or send it out to a lab to do certain testing, depending on the request for testing.
> Q: With respect to the initial samples that you-all received of the white Anigre, did CCI perform testing?
> A: They performed water tests. And basically, that was it pretty much.
> W: Was it recommended by you to anybody that CCI also do UV light testing or color fastness testing?

3

> A: No.
> Q: Did CCI recommend that it be tested for additional color fastness qualities or UV protectant qualities?
> A: That's not our place at—at that juncture. When something is specified it's—it's usually something that has been approved for its usability in the environment that it's being maintained. And we were basically to follow those specifications. We can offer different options, but we don't get involved in testing after the product that's specified is specified. It's just not our place to do that.
> Q: I understand it's not your place because you're following the specs of Daroff.
> A: Yes.

Goodman Dep. at 53:6–54:18.

> Q: You mentioned that CCI did not do any kind of testing on color change as a result of exposure to UV on your control samples prior to fabrication of all the furniture, correct?
> A: Yes, I did.
> Q: But CCI certainly could have, right?
> A: I assume so, yes.

Goodman Dep. 104:21–105:5.

Materials made some recommendations to Atelier about the use of a cold press and how to handle the material to avoid marking or splitting. Goodman Dep. 48:10–20. Materials also specifically warned Atelier about keeping the unfinished product covered to avoid UV exposure and had a general conversation with Atelier about the need to use a finishing product with a UV protectant. Goodman Dep. 63:15–18, 73:12–74:9. However, Materials did not recommend any particular finishing products. Goodman Dep. at 69:19–21. It was CCI that ultimately specifically advised Atelier regarding the chemical finishing process it should use to coat and protect the raw veneer for use with hotel furniture:

> Q: So with respect to what specific finishing products to use, that's where you relied on CCI, correct?
> A: And we brought CCI in to — to do some sampling and finishing for — for our review, yes.

Goodman Dep. at 64:11–16.

4

> Q: You would agree that they [Defendant] did not specifically recommend any finish, correct?
> A: Correct.

Goodman Dep. at 69:19–69:21

> Q: With respect to the finishing specifications, you would agree that those were specified by CCI in detail in terms of the coats and the sealants, right?
> A: Yes, we worked together on that.
> Q: Now, Materials, Inc. never had [a] conversation with CCI, to the best of your knowledge, right?
> A: No, Not that I know of.

Goodman Dep. at 109:18–110:3

A fact of central relevance is that Loews' designer, Darroff, insisted that Atelier produce a specific "look" in finishing the veneer, regardless of the inherent challenges in working with such material.

> Q: And I understand, except for when you're serving as maybe the architect for your own buildings, you're typically following the direction of design firms like Daroff. So you didn't pick the product, correct?
> A: That's correct, yes.
> ...
> [W]e followed the specification that Loews—or the designer specified for the Loews project. And that's, our—our job. Our business is to follow specifications.

Goodman Dep. at 27:13–18, 28:10–13.

> Q: However, it's no surprise that wood, all woods of all different types will change color over time, correct?
> A: Some a little more than others, correct, in their natural state.
> ...
> Q: Like white varies more, correct?
> A: Bleached white, yes.
> Q: At any point in time prior to manufacturing all of this furniture that you did for the Loews Hotel, did you ever mention to anyone that if they really want white, maybe they should use a product other than wood?
> A: We didn't really get into that discussion. Because, again, Daroff is a very high-end designer. And they direct the — the show. And you basically supply them with what they ask for when they want it. And they sign off on approval. So we weren't in a position to — to try to substitute or offer things that we felt were, you know, similar.

5

> Q: Right. But by way of your answer, it's clear that that was something that you already had in mind, but maybe were not at liberty to express?
> A: Yes.

Goodman Dep. at 82:2–84:18.

Finally, the "Warranty Disclaimer" section of the contract ends by advising purchasers that Materials "stand[s] behind the recommendations of the AWI Architectural Woodwork Quality Standards, 8th edition, Version 1.0, 2003 for all wood products." The parties agree that pursuant to those standards, fabricators are cautioned to "avoid BLEACHED VENEERS because of potential finishing problems." Pl.'s Resp. in Opp. Mot. Summ. J., Ex. F at 2.

Plaintiff attaches great significance to the bleaching process used in the manufacture of the veneers. As part of the discovery in this case, Atelier has identified three expert witnesses who would "testify that the problem with the Anigre product sold by materials was that it is bleached and thus inherently unstable from a color fastness perspective." Pl.'s Supplemental Mem. in Opp. to Def.'s Mot. for Summ. J. at 8.

In opposing the Motion for Summary Judgment, Atelier argues that Materials did not "disclose" the fact that the veneer was bleached in making the sale. The record shows, however, that a sales catalog provided to Atelier specifically states: "Natural veneers of different species are first bleached to remove any natural color variation and flaws of the wood," and it describes the veneers as undergoing a "combination of [a] bleaching and dyeing process." Def.'s Mot. Summ. J., Ex. H at 9. Plaintiff's President stated that they had this catalog at the outset of the project and reviewed it with CCI:

> Q: If you could go a few pages later to the information from Materials, Inc. that's included in this packet of information. Did you produce that information to CCI at some point in time?
> A: Yes, we reviewed this with them.
> Q: Where did you get this information from?

6

> A: They had a catalog that was supplied to us when we spent "X" number of dollars to get the material that was specified.
> Q: So you had this at the outset of the project?
> A: We did.

Goodman Dep. 116:3–16.

In addition, Plaintiff's President indicated that this was common knowledge in the industry:

> Q: So what is the origin of your understanding that it's a bleached and dyed veneer?
> A: It's bleached. It's bleached.
> Q: How do you know that?
> A: We were told that. And we—we know it's bleached. You can't turn something brown to white without bleaching it. It's—it's bleached and it's dyed.
> Q: You said "We were told that." Who told you that?
> A: We had been told by other design companies, people that have purchased the veneers. I mean, we're part of an industry. And we talk amongst each other. The material is bleached and it's dyed.

Goodman Dep. at 125:13–126:4.

## II. Procedural Posture of the Case

At the outset of the case, I denied a Motion to Dismiss the claim for breach of the warranty of merchantability because Material's attempted disclaimer was legally insufficient. I granted that same Motion with respect to breach of a warranty of fitness for a particular purpose, because Materials had met the controlling legal standard to make such a disclaimer effective. Defendant Materials also moved to dismiss on the ground that Atelier had failed to state a claim for breach of contract. I denied that portion of the Motion, simultaneously observing that the Complaint was "not a model of clarity or completeness," and further observing that there was "some conceptual tension in enforcing the disclaimer of the warranty for a particular purpose, while simultaneously permitting the breach of contract claim to proceed." Order Ruling on Mot. to Dismiss, Doc. No. 12 at 2, 5.

7

Defendant now moves for summary judgment on both remaining counts, which Plaintiff opposes. Although the parties approach the issues from vastly different perspectives, and to a certain extent failed to engage, the oral arguments on the Motion and certainly the record make the obligations created by the contract sufficiently clear enough to be addressed by the Court.

## III. Standard of Review

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The party moving for summary judgment has the initial burden of identifying the portions of the record that demonstrate an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant need not "support its motion with affidavits or other similar materials negating the opponent's claim." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). It can meet its burden simply by "pointing out ... that there is an absence of evidence to support the nonmoving party's claims." *Id.* at 325.

"The non-moving party must then "rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group. Ltd. v. Colkitt,* 455 F.3d 195, 201 (3d Cir.2006). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252; *see also*

8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the opponent of summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts."). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex,* 477 U.S. at 322.

While it is not a court's role to make credibility determinations or weigh the evidence, a court must assess "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52.

## IV. Breach of Contract Claim

In simple terms, the evidence of record is that Daroff specified the use of Tabu Anigre veneers, Materials supplied samples of the veneers that were tested by Atelier, and then Materials fulfilled the purchase orders and supplied the exact product Atelier requested it to supply in accordance with the instructions of Atelier's client.

Atelier now argues, however, that Materials breached the contract for the sale of those veneers used in the construction of the furniture. The relevant contract term on which Atelier relies is the statement included in the "Warranty Disclaimer" section that advises purchasers that Materials "stand[s] behind the recommendations of the AWI Architectural Woodwork Quality Standards, 8th edition, Version 1.0, 2003 for all wood products." The parties agree that pursuant to those standards, fabricators are cautioned to "avoid BLEACHED VENEERS because of potential finishing problems." Pl.'s Resp. in Opp. Mot. Summ. J., Ex. F at 2. The parties disagree as to the legal significance of this language in the contract.[1] Atelier argues that this

---

[1] Atelier attempts to describe this apparent contradiction as a genuine issue of material fact that precludes summary judgment. Pl.'s Supplemental Mem. in Opp. to Def.'s Mot. for Summ. J. at 4. However, Materials does not dispute

9

means that Materials was contractually bound to provide only products conforming to AWI standards, and since the veneers were bleached, "Materials breached its contract with AAI by selling it a product that was not in accordance with the AWI standards." Pl.'s Supplemental Mem. in Opp. to Mot. for Summ. J. at 9. Atelier points to deposition testimony from Materials' President, who admitted that he found it difficult to reconcile the AWI directive with his company's practice of selling bleached veneers. Pl.'s Resp. to Mot. for Summ. J., Ex. D at 15–16.

*A. Interpreting the Contract*

Under Pennsylvania law, "[i]n construing a contract, a court's paramount consideration is the intent of the parties." *O'Farrell v. Steel City Piping Co.*, 403 A.2d 1319, 1324 (Pa. Super. Ct. 1979). "[I]n order to interpret contracts with some consistency, and in order to provide contracting parties with a legal framework which provides a measure of predictability, the courts must eschew the ideal of ascertaining the parties' subjective intent and instead bind parties by the objective manifestations of their intent." *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir. 1980) (applying Pennsylvania state law). A court may not construe a contract in such a way that it deviates from the plain meaning of the written terms. *Id.* at 1010 (quoting *Best v. Realty Management Corp.*, 101 A.2d 438, 440 (Pa. Super. Ct. 1953)).

However, even a contract term that appears to be clear and unambiguous on its face may reveal a latent ambiguity if the facts of a particular case make the meaning of a term uncertain. *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995) (citing *Easton v. Washington Cty. Ins. Co.*, 137 A.2d 332 (Pa. 1957)). After all, "English is often a difficult and

---

that these two facts are both true. The parties merely disagree as to the effect this has on the duties of Materials under the terms of the contract, and therefore whether Materials is entitled to judgment as a matter of law on the breach of contract claim. Therefore, this question is properly considered by the Court on summary judgment, rather than reserving its determination for a jury. *Liberty Lobby*, 477 U.S. at 248.

elusive language, and certainly not uniform among all who use it. External indicia of the parties' intent other than written words are useful, and probably indispensable, in interpreting contract terms." *Mellon Bank*, 619 F.2d at 1010.[2]

In determining whether a term contains such an ambiguity, the judge must consider the words of the contract, the circumstances under which the contract was made, the alternative meaning suggested by counsel, and any objective evidence offered in support of that meaning. *Id.* at 1011–11; *see also Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 93 (3d Cir. 2001). An ambiguous term should 'receive a reasonable construction and one that will accord with the intention of the parties.' " *Mellon Bank*, 619 F.2d at 1010-11 (citing *United Refining Co. v. Jenkins*, 189 A.2d 574, 580 (Pa. 1963)). A court may consider "the format, construction and terms of the contract generally." *Duquesne Light Co.*, 66 F.3d at 615.

A contract is not rendered ambiguous, however, "by the mere fact that the parties do not agree on the proper construction." *Id.* at 614 (quoting *Samuel Rappaport Family P'ship v. Meridian Bank*, 657 A.2d 17, 21–22 (Pa. Super. Ct. 1995)). "If no 'reasonable' alternative meanings are put forth, then the writing will be enforced as the judge reads it on its 'face.' " *Mellon Bank*, 619 F.2d at 1013 n.13 (citing *Int'l Sys., Inc. v. Pers. Data Sys., Inc.*, 418 A.2d 518, 520 (Pa. Super. Ct. 1980)).

In examining the contract term at issue in this case, I note that it is contained in the second paragraph of a section entitled "Warranty Disclaimer." The first paragraph in that section defines the role of Materials as a supplier who guarantees that all of the products it distributes will be "manufactured to meet *the standard industry specifications of our suppliers.*" Def.'s Mot. for Summ. J., Ex. D. (emphasis added). The reader is thereby first notified that the

---

[2] Although the Parole Evidence Rule typically bars the use of extrinsic evidence to vary or add to the contract, when the parties ask the Court to interpret a potentially ambiguous contract provision, extrinsic evidence of intent is permissible. *Mellon Bank*, 619 F.2d at 1010 n.9.

11

operative standard to which Materials is holding itself is that of its own industry suppliers. Materials then disclaims any warranty of fitness for a particular purpose and reminds the purchaser that Materials is not responsible for any risks the buyer takes in altering the product. The next paragraph, which contains the operative term, turns its focus to the buyer's responsibilities, emphasizing that "[a]ll installation and fabrication are the buyers' responsibility," and offering advice on the use of UV inhibitors. The term referencing the AWI standards then follows. The context thus signals to the reader that Materials is referring the buyer to the AWI standards as a source of information that the buyer should consult when carrying out its own installation and fabrication responsibilities. Since a court may consider "the format, construction and terms of the contract generally," I am persuaded that the context in which the AWI Standards are referenced—at the end of a long disclaimer—is meaningful. *Duquesne Light Co.*, 66 F.3d at 615.

In addition, the AWI standards provide guidelines to fabricators—not suppliers—regarding proper finishing techniques for materials like veneers. Atelier's proffered interpretation of the contract term, then, would require me to find that the reference to AWI standards binds Materials to only sell products that would allow a buyer to construct final projects that are in conformity with the AWI standards. That is not a "reasonable construction" of the contract language. I do not construe the AWI's general admonition against using bleached veneers as creating a duty on the part of Materials to inquire into the details of a project to protect Atelier from making a poor choice. The AWI standards run more than 600 pages. To hold that Materials would have a duty in making every sale to inquire into the details of the particular use of its products defies reason, and imposes the very kind of obligation it specifically disclaims. Finding such a contractual duty would be particularly inappropriate on the facts here,

12

as Atelier looked to Loew's designer and its own consultant for guidance on finishing the product.

Nor do I attach significance to the fact that Materials gratuitously offered advice to Atelier as to the best technique for attaching the veneers, specifically recommending a cold press rather than a hot press. Goodman Dep. at 48:10–20. With respect to the relevant issues here—choice of material and finishing technique—Atelier's choice was driven by Daroff and CCI. Plaintiff's Officer even noted that he was not aware Materials had referenced the AWI:

> Q: And you'd agree that they referred you to AWI standard for selection of appropriate finishing of the veneers?
> A: No, I didn't agree to that. There was never a discussion on them referring us to AWI standards. That was never part of their discussion. That may be in their literature, but it's certainly not in a discussion I had with Steve Kitezh at Materials, Inc.

Goodman Dep. at 69:22–70:7.

It appears, then, that this term is not ambiguous, and Atelier did not rely on representations made by Materials regarding the AWI standards. There are inherent risks of building with veneers, so Materials' general advice to consult the AWI standards serves as a warning to fabricators that they should consult an external source for guidelines on manufacturing with the products provided by Defendant. I do not construe this clause as placing an affirmative duty on Materials, as Plaintiff suggests.

### B. Duty to Disclose

Atelier also claims that Materials had an obligation to disclose to Atelier that the veneers were bleached, and it failed to do so. Although Atelier tries to paint this dispute as a genuine issue of material fact, I find it to be neither genuine nor material.

First, there is no genuine dispute regarding Atelier's access to information stating that the veneers in question were bleached. Tabu's use of bleach is not only revealed in the sales catalog

13

provided to Atelier at the outset of the project, but touted as one of the benefits of its proprietary process. Def.'s Mot. Summ. J., Ex. H at 9. The evidence therefore does not present "a sufficient disagreement ... requir[ing] submission to a jury." *Liberty Lobby*, 477 U.S. at 251-52.

Furthermore, this issue is not material to the breach of contract claim. The record evidence shows that Atelier did not rely on this representation by Atelier since its standards for this custom project were provided by Daroff. Def.'s Supplemental Mem. in Supp. Mot. for Summ. J. at 5–6. In a case in which the buyer is an experienced fabricator of custom wood furniture, and is supported by design professionals and an outside finishing consultant, I cannot discern what duty of disclosure Materials would have, particularly where the buyer specifies a particular veneer from a particular manufacturer. Plaintiff's expert Mike DiGuiro opines: "While Materials Inc. cannot keep companies from specifying their products for applications, when they become aware of the application, they have a responsibility to let the customer know when the materials specified do not meet the standards of an organization that they tout as adhering to in their literature." Report of Mike DiGuiro at 3–4. Although I must view all facts in the light most favorable to the non-movant in considering a Motion for Summary Judgment, I need not defer to any expert's purported legal conclusions.

To the extent that Atelier is arguing that Materials had a duty to notify it that the bleached process made the veneers inappropriate for this project, it seeks to revive the argument that Materials breached the warranty of fitness for a particular purpose, which was adequately disclaimed. This was foreshadowed by my opinion on the Defendant's Motion to Dismiss: "Plaintiff's contractual claim would seem to depend upon Materials' understanding of the use to which the veneer would be put. It might be that this disclaimer [of fitness for a particular purpose] language has evidentiary significance in defining the scope of the agreement between

14

the parties." Order Ruling on Mot. to Dismiss, Doc. No. 12 at 5–6. Plaintiff cannot now use this "duty to disclose" argument as a backdoor method of reviving the warranty for a particular purpose claim. Perhaps bleached veneers were not an appropriate choice for this context, but Materials did not warrant that they were and therefore had no corresponding duty to alert Atelier to this fact.

### C. Damaged Veneers

Plaintiff's Breach of Contract claim also encompasses a claim for damages resulting from veneers that were provided by Materials but not used to produce the furniture in question because they were blemished. Ateliers alleged in its Complaint that

> Materials shipped to AAI certain other material that arrived wet and moldy, splitting at the seams and yellowed and could not be sued. Other product purchased from Materials was damaged during the trucking process on a carrier arranged by Materials. AAI immediately put Materials on notice of the problems, including sending it samples and photographs of the defective and damaged product, but Materials did nothing to address the issue.

Compl. at ¶ 15. Atelier says that Materials refused to replace the damaged product, forcing Atelier instead to purchase more veneers to replace the damages ones, and Atelier "seeks as one element of its breach of contract claim the additional cost of the additional veneer it purchased from Materials." Pl.'s Second Supplemental Mem. in Opp. Def.'s Mot. Summ. J. at 4.[3]

Despite the allegations in the Complaint—which assert that that "Materials shipped to AAI" the materials at issue "on a carrier arranged by Materials"—the record evidence indicates that Atelier actually picked the veneers up from Materials' warehouse in its own truck and delivered the goods to a warehouse owned by a third party, Versatek. In its own supplemental

---

[3] Atelier argues that this claim for damages resulting from the moldy veneers is part of its case, but not part of Defendant's Motion for Summary Judgment. Pl.'s Second Supplemental Mem. Opp. Def.'s Mot. Summ J. at 1. Although Materials did not address the facts pertinent to this claim in its initial Motion for Summary Judgment, it was made clear through supplemental briefing and oral argument that Defendant motioned for summary judgment on all claims, including the claim for the moldy veneers, which Plaintiff stated was an element of Count I in the Complaint for Breach of Contract. The parties were permitted to supplement the record with evidence relevant to this claim.

15

brief, Atelier admits that an "AAI driver ... picked up" the pallets of veneers "at defendant's place of business." Pl.'s Second Supplemental Mem. in Opp. Def.'s Mot. Summ. J. at 2. The veneers were then inspected, and damage was revealed.

Because of this sequence of events, the parties disagree about whether Atelier rejected the goods upon discovering the problem, or whether it accepted the goods and then attempted to revoke its acceptance. This distinction is important because under the UCC in Pennsylvania, a party may reject goods showing any nonconformity, 13 Pa.C.S. § 2601, but if he accepts the goods, he may only later revoke his acceptance if the nonconformity "substantially impairs its value to him," and he has accepted it either (1) on the reasonable assumption that nonconformity would be cured, or (2) "if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the assurances of the seller." 13 Pa.C.S. § 2608. Under 13 Pa.C.S. § 2606, which establishes "what constitutes an acceptance," a buyer may be deemed to have accepted the goods by default if he fails to reject the goods within a reasonable time. *See SCM Grp., USA, Inc. v. Custom Designs & Mfg. Co.*, 89 F. App'x 779, 780 (3d Cir. 2004).

Ultimately, this disagreement reveals a genuine issue of material fact that precludes the Court from deciding this issue. Under Pennsylvania law, the questions of whether a nonconformity exists, whether the nonconformity substantially impairs the value of the good to the purchaser, and whether the rejection or revocation of acceptance of goods occurred within a reasonable time after tender or delivery are generally deemed to be questions of fact to be resolved by the fact finder. *Ford Motor Credit Co. v. Caiazzo*, 564 A.2d 931, 936 (Pa. Super. 1989). A reasonable jury could find that black marks and mold constituted a nonconformity that substantially impaired the value of those veneers to Atelier, Atelier inspected and revoked their acceptance of the goods within a reasonable time after tender, and Materials has not yet fully

16

compensated Atelier for the damages. This discrete claim —limited to veneers damaged or moldy at the time of tender—is therefore inappropriate for summary judgment.

## V. Breach of Warranty of Merchantability Claim

Defendant also seeks summary judgment on Plaintiff's claim for Breach of the Warranty of Merchantability. Atelier has produced a report from a qualified expert, Mike DiGiuro, who conducted an in-depth analysis of the reason for the discoloration in the veneer and the series of design and fabrication decisions that led to Loews' dissatisfaction. Although Atelier suggests that this report supports their breach of warranty claim, the conclusions reached by its experts undercut rather than support the existence of a defect.

Pennsylvania law provides that, for merchant sellers of goods, "[a] warranty that the goods shall be merchantable is implied in a contract for their sale." 13 Pa.C.S. § 2314(a). "The concept of 'merchantability' does not require that the goods be the best quality, or the best obtainable." *Gall by Gall v. Allegheny Cnty. Health Dep't*, 555 A.2d 786, 789–90 (Pa. 1989) (citations omitted); *Altronics of Bethlehem, Inc. v. Repco, Inc.,* 957 F.2d 1102, 1105 (3d Cir. 1992) (citing 13 Pa.C.S. § 2314(b)(3)). To qualify as merchantable, goods must simply "pass without objection in the trade under the contract description," be of "fair average quality," be fit for the ordinary purposes for which the goods are used, display an even level of quality among all units, be adequately packaged, and conform to any promises made on the label. 13 Pa.C.S. § 2314(b). To prove a breach of the warranty of merchantability under Pennsylvania law, "a plaintiff must show that the equipment obtained from the supplier was defective," and that the defect occurred in the absence of abnormal use and reasonable secondary causes. *Visual Commc'ns, Inc. v. Konica Minolta Bus. Solutions U.S.A., Inc.*, 611 F. Supp. 2d 465, 470 (E.D.

17

Pa. 2009) (citing *Altronics*, 957 F.2d at 1105). Plaintiff bears the burden of eliminating any alternative causes fairly suggested by the evidence. *Altronics*, 957 F.2d at 1106.

Atelier has not pointed to any defect in the product itself beyond the fact that it was bleached, which is an advertised characteristic of the product. In its supplemental brief, Atelier articulates its evidence of the defect as follows: "Experts will testify that problem with veneers is that they were bleached and thus inherently unstable from a color fastness perspective, [and] that the bleaching of the White Anigre made it difficult to delay the inherent yellowing characteristics of the product." Specifically, the ultimate opinion rendered by Mr. DiGiuro in the section of his report entitled "Conclusions" states: "the discoloration was not caused by any process or procedure completed by AAI, but was an inherent characteristic in the veneer, and AAI did everything they could have reasonably done to meet the specifications provided by Daroff Design and Loews." Report of Mike DiGiuro at 5.[4] Another expert, Ronald Obie, states that "the bleached Anegre veneer is strongly prone to oxidation." Report of Ronald Obie at 4. Atelier identifies no flaw in the process by which the veneers were bleached. It asserts only that the use of bleach to obtain the "look" of the veneer panels made it harder to finish them in a way that would resist yellowing. Plaintiff's experts themselves explicitly state that the product reacted in the way that bleached veneers are expected to react under certain field conditions. In short, the admission that preserving colorfastness is one of their "inherent" challenges of bleached veneers is fundamentally inconsistent with Altelier's theory of defect; Atelier cannot assert as a defect an intrinsic feature of the product it specified. As bleached veneers, the goods were of "fair average quality" and would "pass without objection in the trade under the contract

---

[4] DiGuiro's report also addresses the question of whether Atelier, with the advice of CCI, was in any way at fault for the discoloration because of the sealant used. The report indicates that the sealant used did not cause the yellowing, and it was an appropriate choice for preventing the yellowing. Report of Mike DiGuiro at 4–5. This evidence may be relevant to Plaintiff's separate burden to prove that "the defect occurred in the absence of abnormal use and reasonable secondary causes," *Konica Minolta*, 611 F. Supp. 2d at 470, but does not establish a defect.

18

description." 13 Pa.C.S. § 2314(b). Any problems stemmed from the use to which they were put.

To be sure, this "inherent characteristic" may be highly relevant to a fabricator's decision about how and where to use this product. In an effort to prove that the goods are not fit for the ordinary purposes for which the goods are used, Atelier attempts to define the scope of the product's purpose narrowly—as the manufacture of hotel furniture—and then argue that the product is obviously defective because it discolored when used for that particular purpose, to an extent that it is no longer usable for use in that particular high-end context. Once again, this erroneously conflates merchantability with fitness for a particular purpose.

## VI. Conclusion

For these reasons, Defendant's Motion for Summary Judgment is granted as it pertains to the Breach of Contract claim for the veneers used in the construction of the furniture, and for the Breach of the Warranty of Merchantability claim. The Motion is denied as it pertains to Plaintiff's discrete and limited breach of contract claim for allegedly damaged and moldy veneers. An appropriate order follows.

/s/ Gerald Austin McHugh
Gerald Austin McHugh
United States District Court Judge